# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# OCALA DIVISION

CHRISTOPHER ALLEN BROWN,

    Plaintiff,

    v.

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

Case No. 5:23-cv-698-RMN

## MEMORANDUM DECISION AND ORDER[1]

Plaintiff, Christopher Allen Brown, seeks review of the Commissioner of Social Security's final decision denying his application for disability insurance and supplemental security income. Dkt. 1.[2] Because the Commissioner's final decision is not supported by substantial evidence, pursuant to sentence four of 42 U.S.C. § 405(g), this case is **REVERSED** and **REMANDED**.

---

[1] With the parties' consent, this matter was referred to me to conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. *See* Dkts. 11, 12.

[2] In this decision, citations to the administrative record are denoted as "R. ___." The citations reference the Bates number annotated on the bottom of each page. *See* Dkt. 9.

## I.  BACKGROUND

### A.    Agency Proceedings

Brown applied for disability benefits and supplemental security income on April 9, 2021, alleging a disability onset date of November 28, 2020. R. 17, 223–24. The agency denied his claim initially and upon reconsideration. R. 112–121, 127–140. Brown then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on March 30, 2023. R. 148, 731–758. On May 3, 2023, the ALJ issued a written decision denying the application. R. 14–61. Brown sought review of that decision by the agency, but his request for review was denied. R. 1–6. The ALJ's decision is the Commissioner's final decision. R. 1.

### B.    The ALJ's Decision

Brown was 38 years old on the alleged disability onset date. R. 27. Brown has a high school education, completed two years of college, and took a leave of absence from school after being hospitalized for COVID-19 in December 2020. R. 384–406, 822. He has past relevant work as an electrician apprentice, store laborer, electrician technician, and security guard. R. 27, 55, 241. He alleged disability arising from post-traumatic stress disorder ("PTSD"), COVID-19, back injury, lung condition, and sleep apnea. R. 240.

The ALJ evaluated Brown's application using the five-step sequential evaluation process. R. 18–29. The ALJ first found that Brown

met the insured status requirement of the Social Security Act through December 31, 2025. R. 20. At step one, the ALJ found that Brown had not engaged in substantial gainful activity since his alleged onset date. R. 20. At step two, the ALJ found Brown had severe impairments, including back disorder (lumbago and cervicalgia), tinnitus, diabetes mellitus type 2, hypertension, hypothyroidism, hyperlipidemia, sleep apnea, obesity, depressive disorder, PTSD, anxiety, and Asperger's syndrome. R. 20. The ALJ then determined at step three that Brown did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 20–21.

Moving to the next part of the evaluation process, the ALJ found that Brown had the residual functional capacity ("RFC") to perform a modified range of light work with the following additional limitations:

> [H]e can lift, carry, push and/or pull twenty (20) pounds occasionally and ten (10) pounds frequently. He can stand and walk for six (6) hours and can sit for six (6) hours in an 8-hour workday with normal breaks. He could occasionally climb stairs, balance, stoop, kneel, crouch and crawl, but should never climb ladders or scaffolds. He must avoid exposure to vibration, unprotected heights and hazardous machinery. This individual can handle exposure to a noise level intensity not above the "moderate" level as defined in the Selected Characteristics of Occupations (SCO). . . . During the eight-hour workday, he must avoid concentrated exposure to extreme heat, cold, wetness, humidity, and irritants such as fumes, odors, dust, and gases. This

> individual can follow only simple instructions. This person should have no interaction with the general public unless it is merely superficial, and only occasional interaction with co-workers. . . . This person is limited to jobs requiring only occasional decision-making and changes in the work setting.

R. 21–27. Based on this determination, at step four, the ALJ concluded that Brown could not perform his past relevant work. R. 27.

At the last step, the ALJ considered Brown's age, education, work experience, residual functional capacity, and the testimony of a vocational expert ("VE"). R. 28, 56–57. Because the ALJ determined other jobs exist in significant numbers in the national economy that Brown can perform—such as marker, garment sorter, and office—the ALJ concluded that he was not disabled. R. 27–28.

## II.  STANDARD OF REVIEW

A court's only task in reviewing a denial of disability benefits is to determine whether the Commissioner's decision is "supported by substantial evidence and based on proper legal standards." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). Substantial evidence "is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id*.

Courts reviewing a decision denying disability benefits may not "decide the facts anew, make credibility determinations, or re-weigh the evidence." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005)

(cleaned up). Rather, courts must affirm the decision if the denial is supported by substantial evidence, even if the preponderance of the evidence weighs against the Commissioner's findings. *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015). Courts review the Commissioner's legal conclusions de novo. *Lewis v. Barnhart*, 285 F.3d 1329, 1330 (11th Cir. 2002).

## III. ANALYSIS

Brown argues that the ALJ's decision is not supported by substantial evidence and that the ALJ erred in not discussing whether Brown's COVID-19 was a medically determinable impairment, likening the purported error to those made in prior decisions in which a claimant suffered from fibromyalgia. Dkt. 16 at 3–11. The Commissioner argues that substantial evidence supports the limitations assessed by the ALJ, and that the RFC includes the necessary limitations related to Brown's COVID-19 diagnosis. Dkt. 17 at 12–13.

The ALJ is tasked with assessing a claimant's RFC and ability to perform past relevant work. *See* 20 C.F.R. § 404.1546(c); 20 C.F.R. § 404.1527(d)(2) (the assessment of a claimant's RFC is an issue reserved for the Commissioner); *see also Robinson v. Astrue*, 365 F. App'x 993, 999 (11th Cir. 2010) ("[T]he task of determining a claimant's [RFC] and ability

to work is within the province of the ALJ, not of doctors.").[3] The RFC "is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite [her] impairments." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). In determining a claimant's RFC, the ALJ must consider all relevant evidence, including the opinions of medical and non-medical sources. *See* 20 C.F.R. § 404.1545(a)(3).

## A.    Medical Evidence Summary

In rendering the RFC finding, the ALJ discussed objective medical evidence as follows. Brown presented in the emergency department with a fever and vomiting two days after having a surgical procedure on his left foot. R. 23, 369. His physical examination was normal, except for a bandage to his left lower extremity. R. 23, 369, 371. An x-ray showed right perihilar opacities, which could be secondary to pneumonia. R. 23, 374.

Brown was hospitalized for COVID-19 on December 22, 2020. R. 384–406, 822. He developed severe hypoxia and was placed on high-flow oxygen. R. 389. He was diagnosed with pneumonia secondary to COVID-19 infection and was placed in ICU for seven days. R. 23, 389, 409,

---

[3] "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

581. The ALJ noted Brown's admission records detail past medical history of hypertension, type II diabetes, and hypothyroidism. R. 23, 392.

On January 8, 2021, one week after Brown's discharge, he returned to the emergency department complaining of shortness of breath and mild cough. R. 23, 552. He tested positive for COVID. R. 556. Upon examination, his lungs were clear to auscultation, he had equal breath sounds and regular respirations, his range of motion of the back and musculoskeletal system were normal, he had regular heart rate and rhythm, and was cooperative, alert, and oriented, with normal mood and affect. R. 23, 552–54. Brown was assessed with dyspnea (shortness of breath). R. 554. After several hours he left the emergency department against medical advice because he was upset that his wife could not be with him in the hospital, and he refused the recommended EKG, chest X-ray, and CT chest. R. 556. He was discharged in "improved condition." R. 23, 556. It was noted he appeared dyspneic. R. 554.

In his decision, the ALJ explained that January 11, 2021 pulmonary treatment records reveal "normal physical examination findings, including normal respiratory examination, normal cardiovascular examination, no edema, and normal visual overview of all extremities." R. 23, 584, 588. The ALJ again noted that Brown was assessed with history of COVID-19, shortness of breath, and sleep apnea. R. 23, 584,

588–89. The ALJ noted that treatment records from December 2020 through March 2021 showed complaints of exercise intolerance, diaphoresis, pallor, shortness of breath, decreased cognitive functioning, stuttering, and anxiety. R. 23, 598, 603, 608, 62–13, 617. The ALJ also recognized Brown's history of musculoskeletal impairments, including left-sided moderate spurring in the cervical spine, and multilevel degeneration in the lumbar spine without the necessity of surgical intervention. R. 23, 630. These symptoms were treated with muscle relaxants, anti-inflammatories, and physical therapy. R. 23, 630.

As the ALJ explained, January and February 2021 physical examinations showed that Brown had limited ambulation, ambulation with a cane, dyspneic on exertion, and irregular gait, but were otherwise normal. R. 23, 603–04, 608–09, 613. On March 11, 2021, Brown had a telehealth primary care office visit, complaining of shortness of breath, decreased cognitive functioning, stuttering, and anxiety. R. 598. He was described as being "confused" with an "abnormal affect." R. 598. He had normal motor strength and movement of all extremities and was assessed as having COVID-19 with a slow recovery; treatment notes stated this condition was "somewhat improved" but "not improved enough to return to work" and he suffered from acute respiratory distress syndrome that was improving. R. 23, 599–600, 604. There was a concern for post-COVID

cerebral vascular accident (stroke). R. 599. He was referred to neurology due to his cognitive changes after COVID and to cardiology due to his tachycardia post-COVID. R. 599–600.

The ALJ recognized that Brown had been diagnosed with essential hypertension, obstructive sleep apnea (treated with CPAP, noted non-compliance), and type II diabetes (uncontrolled) during the relevant period. R. 24, 634–35, 1838. As the ALJ observed, Brown's brain CT and EKG were normal. R. 24, 692–93, 1830.

Treatment records from Brown's neurologist from June 2021 revealed that Brown had normal gait, normal sensation, and normal cardiovascular and respiratory examinations. R. 24, 745–46. Brown complained of shortness of breath, back pain, muscle weakness, anxiety, depression, and memory loss. R. 744. The physical examination showed the following: BP 157/106, BMI 42.17, neck weakness, right sided weakness 4/5 but 5/5 otherwise, normal hearing, normal sensation, bilateral upper extremity intention tremor, normal gait, no rales/rhonchi/wheezes, regular heart rate and rhythm, no murmur/rub/gallop, and intact cranial nerves. R. 24, 745–46.

On May 27, 2021, Brown was seen by the neurologist with complaints of impaired cognition, reporting "[h]e often forgets what he is doing and it is difficult for him to complete tasks." R. 748. The medical

neurological team member stated, "[w]e will consider [n]europsychological evaluation" but "[w]e should holdoff on formal evaluation since the patient is still recovering from Covid-19." R. 748. Brown was reported as having back pain, muscle weakness, anxiety, depression, memory loss, and a history of cognitive changes after COVID. R. 749. Psychiatric progress notes from June 10, 2021, note his chief complaint of anxiety, and he explained that after COVID diagnosis from January "he has been feeling fatigue, gets short of breath with exertion" and feels anxious with two or three anxiety attacks per day. R. 810. His mood was depressed and anxious, but his concentration and memory were normal. R. 813. He was diagnosed with major depressive disorder, social anxiety disorder, Asperger's Syndrome, sleep apnea, and diabetes. R. 813.

The ALJ discussed that Brown's June 21, 2021 VA records show non-antalgic gait that was steady and independent, "good and clear" lungs bilaterally, blood pressure within normal limitations, no edema, and no acute distress. R. 24, 808. He asked for a referral to psychiatry because he had been unable to attend previous appointments because of COVID-19 illness, reporting his "recovery was slow" but he "[f]eels a whole lot better," except for occasional dyspnea helped by his prescribed inhaler. R. 807. As of that date his prescriptions included albuterol inhaler for shortness of breath, benzonatate as needed for cough, budesonide inhaler, medications

for anxiety and diabetes, and guaifenesin as needed to thin mucous. R. 807–08. His lungs were good and clear. R. 808.

Brown was assessed by his primary care team on September 29, 2021, complaining of shortness of breath but no cough, wheezing, or coughing up blood, as well as anxiety. R. 1759. On exam he was noted as having dyspneic (mild on exertion) with good air movement, and showed good judgment, alert and anxious on mental stats exam, with recent memory abnormal. R. 1759. It was noted he had chronic bronchitis, with suspected relation to post-COVID lung disease. R. 1760.

The ALJ noted that Brown had independent mobility and ability to perform self-care without assistance with tenderness of the lumbar spine and SI joint and decreased range of motion of the lumbar spine. R. 24, 1332–33. Brown's October 2021 pulmonary function test showed normal findings indicating the absence of any significant degree of obstructive pulmonary impairment or restrictive ventilatory defect. R. 24, 1280. Treatment records from December 2021 also showed normal respiratory findings, normal gait and station, no dyspnea, normal movement of all extremities, and tenderness of the lumbar spine. R. 24, 1752. His anxiety and major depressive disorder were noted, as were posterior rhinorrhea with chronic cough. R. 1752. The ALJ also considered Brown's history of chronic tinnitus in making the RFC finding, noting that Plaintiff used

binaural hearing aids for tinnitus management, but that he could hear and understand normal conversational speech with bilateral hearing aids during evaluation. R. 24, 1846, 1868.

As the ALJ noted, consultative examination notes, dated October 6, 2022, continued to reveal that Brown had normal gait, no pain or discomfort, regular heart rate and rhythm, no murmurs, "mildly decreased bilateral breath sounds," mild difficulty getting in/out of a chair and examination table, no cyanosis/clubbing/edema, no spinal tenderness, intact sensation, 2+ reflexes, negative straight leg raise testing, mild difficulty with tandem/heel/toe walk, moderate difficulty squatting, full grip strength, full strength in the upper extremities, 4/5 strength in the lower extremities, and normal hearing with the use of hearing aids. R. 25, 1872–73. The ALJ reported that Brown was assessed with hypertension, history of COVID infection, history of dyspnea on exertion, history of chronic low back pain, history of chronic tinnitus, use of bilateral hearing aids with fair results, generalized anxiety disorder, and PTSD. R. 25, 1874. Brown's blood pressure readings showed improvement. R. 25, 1911. The ALJ also noted Brown's obesity, with his body mass index of 39, coupled with his hyperlipidemia, weight loss recommendations, and dietary restrictions. R. 25, 1853.

As for Brown's mental health impairments, records indicate Brown suffered from mixed anxiety and depressive disorder with an onset date of December 3, 2018. R. 596. The ALJ explained that Brown had normal psychiatric findings on physical examination from 2020 and 2021. R. 25, 371, 390, 519, 554, 584, 745. The ALJ recognized that Brown suffered from anxiety and depression with associated symptoms of worrying, restlessness, deficits in sleep, deficits in concentration/focus, and financial stress. R. 25, 797–98, 827. Mental health treatment records from 2022 revealed some abnormal findings, including anxious/dysthymic mood and restricted/tearful affect, but Brown was cooperative and adequately groomed, with normal attention and concentration, normal memory, fair insight and judgment, coherent/logical/goal-directed thought process, realistic thought content, self-awareness, and he understood the likely outcome of behavior. R. 26, 1768, 1786–87, 1789, 1803–04, 1806, 1809, 1952.

As the ALJ noted, Brown's October 2022 mental status examination revealed that he was alert with appropriate dress, and he was cooperative with normal speech, irritable mood, restricted affect, normal attention and concentration, normal memory, normal thought processes, no auditory or visual hallucinations, no delusional thoughts, fair judgment and insight, and full orientation. R. 26, 1856. The ALJ further recognized

that Plaintiff's mental health impairments were treated conservatively throughout the relevant period, with medication and therapy. R. 26.

### B.    Plaintiff's Claims

As previously noted, the ALJ found that Brown could perform a less than light exertional work with environmental limitations, occasional postural limitations, limitations in interacting with others, as well as limitations in concentration, persistence, and maintenance of pace. R. 26–27. Brown challenges the ALJ's consideration of the residual effects from his COVID-19 hospitalization and his subjective complaints related to these residuals, when he failed to discuss whether COVID-19 was a medically determinable impairment ("MDI").

Citing to *Marcus v. Commissioner of Social Security*, No. 6:21-cv-1745, 2023 WL 1860638, at *3 (M.D. Fla. Feb. 9, 2023), and *Nowaczyk v. Kijakazi*, No. 5:21-cv-63, 2022 WL 3031230, at *5 (N.D. Fla. July 12, 2022), *report and recommendation adopted*, No. 5:21-cv-63, 2022 WL 3030546 (N.D. Fla. Aug. 1, 2022), Brown argues that the ALJ similarly erred because in those cases, the ALJ discussed medical records showing that the claimants had been diagnosed with fibromyalgia but did not consider fibromyalgia a medically determinable impairment.[4] Dkt. 18 at

---

[4] The Social Security Administration issued SSR 12-2p to provide guidance on how to determine whether a person has a medically determinable impairment of fibromyalgia and how it will evaluate this impairment in a disability claim. *See* SSR 12-2p, 2012 WL 3104869 (July

1. In *Marcus*, the Court found error because the Eleventh Circuit had loosened the need for objective evidence to establish disability from fibromyalgia since a "hallmark" of that disease was the lack of objective evidence, referring to the Circuit's finding that "a claimant's subjective complaints may be the only means of determining the severity of [her] condition and the functional limitations she experiences." *Horowitz v. Comm'r of Soc. Sec.*, 688 F. App'x 855, 863 (11th Cir. 2017).

Brown argues that COVID has a similar hallmark due to lack objective evidence. Dkt. 18 at 2. He relies on the Centers for Disease Control and Prevention's Long COVID or Post COVID Conditions paper, which "states that people with Long-COVID may have symptoms that are hard to explain and manage and that clinical evaluations and objective testing and imaging are often normal."[5] Dkt. 18 at 4. He also relies on the

---

25, 2012); *Francis v. Saul*, No. 8:18-cv-2492, 2020 WL 1227589, *3 (M.D. Fla. Mar. 13, 2020). The ruling informs ALJs in how to consider fibromyalgia in the five-step process. SSR 12-2p, 2012 WL 3104869 (July 25, 2012). "Although SSRs do not have the same force and effect as statutes or regulations, they are binding on all components of the Social Security Administration." 20 C.F.R. 402.35(b)(1). Soc. Sec. Ruling, SSR 12-2p; Titles II & XVI: Evaluation of Fibromyalgia, SSR 12-2P (S.S.A. July 25, 2012).

[5] *See* Centers for Disease Control and Prevention, COVID-19, Long COVID, Symptoms that are hard to explain and manage ("CDC Long COVID Paper"), https://www.cdc.gov/coronavirus/2019-ncov/long-term-effects/index.html.

Brown's reference to Long COVID requires some background to understand. When someone is infected with a virus called SARS-CoV-2,

Social Security Administration's Emergency Message ("EM") regarding

evaluation of COVID-10 cases.[6] The EM provides policy guidance for

_____

they may suffer an acute medical condition called COVID-19. *See* Coronaviridae Study Grp. of the Int'l Comm. on Taxonomy of Viruses, *The species Severe acute respiratory syndrome-related coronavirus: classifying 2019-nCoV and naming it SARS-CoV-2*, 5 Nat. Microbiol. 536, 539 (Mar. 2020). The infected person becomes ill and may be hospitalized, but the person's innate and adaptive immune responses usually clear the virus within a short time and resolve the symptoms caused by infection. *See, e.g.*, *Acute*, Dorland's Illustrated Medical Dictionary 24 (33rd ed. 2020). For the unlucky, however, SARS-CoV-2 infection can cause a different, chronic medical condition called post-acute sequelae of COVID-19 or, more simply, Long COVID.

[6] The guidance further states:

> Coronavirus Disease 2019 (COVID-19) is a relatively new disease caused by the virus SARS-CoV-2. COVID-19 is highly variable in presentation, ranging from asymptomatic infection to severe illness. While COVID-19 presents primarily as a respiratory disease, it may also lead to cardiovascular, renal, dermatological, neurological, psychiatric, or other complications. The medical community is still learning about the severity of the illness, its long-term effects, and emerging variants of the virus.

> Studies have found that about one in five people who recover from the acute or initial phase COVID-19 illness report long-term health effects they had not experienced before contracting the virus. These lingering or chronic health problems following the acute phase of illness is clinically described as Post-acute Sequelae of SARS-CoV-2 infection (PASC) – more commonly known as Long COVID.

https://secure.ssa.gov/apps10/reference.nsf/links/03282024111904AM (last visited October 16, 2024) ("EM Message"). This EM was initially

evaluating disability cases that include an allegation or diagnosis of

COVID-19. It states:

> Studies have found generally poorer long-term health outcomes among older individuals; people with pre-existing comorbidities (such as hypertension, diabetes, asthma, and obesity); and those with a history of cigarette smoking or substance abuse. People who were hospitalized during the acute phase of COVID-19 tend to experience more severe and persistent Long COVID symptoms. Sometimes, COVID-19 causes no post-acute effects. When there are such post-acute effects, their severity can range from mild to extreme. Therefore, we must evaluate Long COVID symptoms on an individual basis.
>
>                              \* \* \*
>
> We must consider whether COVID-19, Long COVID, a new MDI(s) caused by COVID-19, or any MDI(s) that has worsened because of COVID-19 meets or medically equals a listing (DI 22001.001D.3 and DI 28005.015A.2). COVID-19, on its own, cannot meet a listing, but it may equal a listing as an unlisted impairment or as part of a combination of impairments (DI 24508.010). The same is true for Long COVID. COVID-19 and Long COVID may affect respiratory, cardiovascular, renal, neurological, or other body systems. In most cases, the listing relevant to a new MDI(s) caused by COVID-19, or any MDI(s) that has worsened because of COVID-19 will be the appropriate listing to consider.

EM Message.

      Disability evaluators are to consider whether any COVID-related

impairment was "of 'listing level' severity," and, if not, to "assess [the

claimant's] residual functional capacity (RFC) to determine whether they

---

issued on August 9, 2022, before the date of the ALJ's decision, and was revised effective March 28, 2024. *Id.*

have any functional limitations caused by symptoms of COVID-19 or any resulting MDI(s)." *Anthony Edward G. v. O'Malley*, No. 23-cv-1611, 2024 WL 3442415, at *5 (S.D. Cal. July 17, 2024), *report and recommendation adopted,* No. 23-CV-1611, 2024 WL 3799439 (S.D. Cal. Aug. 12, 2024). According to Brown, the ALJ erred when, although discussing the symptoms Brown alleged, he used largely unremarkable objective evidence to dismiss these symptoms. Dkt. 18 at 3.

The Commissioner argues that Brown has shown no error because the ALJ discussed Plaintiff's COVID-19 diagnosis, hospitalization, and treatment throughout the decision, including noting that he had a slow recovery from COVID-19 and discussing his respiratory, cardiovascular, musculoskeletal, and mental health treatment records. Dkt. 17 at 12. The Commissioner also argues that Brown essentially asks the Court to re-weigh the medical evidence of record, and he suggests that any errors by the ALJ are harmless because the RFC assessment accounts for any limitations supported by the record. Dkt. 17 at 12.

I disagree with the Commissioner. Another federal court recently remanded a similar case, finding the ALJ's failure to appropriately consider the evidence related to the residual impact of the claimant's COVID-19 was not harmless:

> Most significantly, although the ALJ acknowledged that Plaintiff was hospitalized and placed on a ventilator due

> to COVID-19 and that she continued to experience
> dyspnea on exertion and shortness of breath following
> her discharge and while at home with oxygen, the ALJ
> failed to acknowledge that shortness of breath on
> exertion remained a persistent and limiting problem
> throughout the medical record, extending beyond the
> twelve-month durational requirement. As the medical
> summary following her hospitalization demonstrates,
> the record is replete with references to Plaintiff's
> shortness of breath and/or fatigue with exertion,
> including when walking or climbing stairs.

*A.H. v. O'Malley*, No. cv-22-4942, 2024 WL 4190865, at *7 (E.D. Pa. Sept.

13, 2024). So too here.

Remand is required because the ALJ erred in evaluating evidence

of Plaintiff's COVID-19 residuals, particularly as to persistent dyspnea on

exertion and increased anxiety and difficulty in concentration. Brown

testified that after being diagnosed with COVID, he suffered from labored

breathing, problems with exertion, and shortness of breath on a daily

basis. R. 48. On March 11, 2021, Brown complained of shortness of breath,

decreased cognitive functioning, stuttering, and anxiety. R. 598. On May

27, 2021, Brown was reported as having back pain, muscle weakness,

anxiety, depression, memory loss, and a history of cognitive changes after

COVID. R. 749. On September 29, 2021, he again complained of shortness

of breath as well as anxiety. R. 1759. On exam he was noted as dyspneic,

alert and anxious on mental stats exam, with recent memory abnormal,

suffering from chronic bronchitis, with suspected relation to post-COVID

lung disease. R. 1759–60. The ALJ failed to acknowledge that shortness of breath on exertion remained a persistent and limiting problem throughout the medical record, possibly extending beyond the twelve-month durational requirement.

As to Brown's mental impairments, the ALJ found Plaintiff's depressive disorder, PTSD, anxiety, and Asperger's syndrome to be severe, but after considering whether the "paragraph B" criteria are satisfied, found that Brown does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.[7] R. 20–21. But the ALJ did not consider whether and to what extent depression, anxiety, or any of his other mental or physical health problems were attributable to COVID-19. Nor did he consider if any of these conditions satisfied the severity of duration requirements, as required by the Commissioner's policy guidance.

In his decision denying benefits, the ALJ acknowledged Brown's reports of decreased concentration and mental status reports evidencing anxiety and depression, R. 25, but he did not address whether Brown's

---

[7] The ALJ considered whether the severity of Brown's physical impairments met Listing 1.15, (disorders of the skeletal spine resulting in compromise of a nerve root) and Listing 1.16 (lumbar spinal stenosis resulting in compromise of the cauda equina) and whether his mental impairments met Listing 12.04 (depressive, bipolar, and related disorders), Listing 12.06 (anxiety and obsessive-compulsive disorder) and Listing 12.15 (trauma and stressor related disorders). R. 20.

mental health issues could be attributable to COVID-19 residuals, although he did include mental health limitations in his RFC assessment.

On remand, the ALJ shall reconsider all the evidence in light of Social Security guidance regarding the impact of COVID-19, and obtain an updated expert medical opinion, if deemed necessary. The ALJ shall also consider the evidence of Long COVID and evaluate whether the evidence shows that Long COVID was a medically determinable impairment of sufficient duration.[8]

---

[8] A careful review of the record demonstrates the ALJ did not comply with the Commissioner's guidance. For instance, to determine if a claimant has an MDI for COVID-19, the ALJ was instructed to look for objective medical evidence of a positive viral test, diagnostic tests with findings consistent with COVID-19, or a diagnosis of COVID-19 with signs consistent with COVID-19.

The record contains objective medical evidence that falls within all three categories. It contains a positive viral test. R. 425–26. It contains multiple reports of diagnostic tests with findings consistent with COVID-19. *Compare* R. 392–93, 401, 404–11 (noting diagnostic test findings consistent with COVID-19) *with* R. 362 (pre-operative hospital admission noting finding of clear lungs on chest x-rays). And it contains records documenting Brown's hospitalization based on a diagnosis of COVID-19 with signs consistent with COVID-19. *See, e.g.*, R. 392–93 (admission summary documenting fever and shortness of breath), 395 (consult confirming COVID-19 diagnosis), 437 (noting "multifocal pneumonia secondary to COVID-19" was "present on admission").

On remand, the ALJ shall evaluate all the record evidence, make the determinations required by the Commissioner's guidance, and provide a written explanation on each determination.

## IV.  CONCLUSION

Accordingly, it is **ORDERED**:

1.    Pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's final decision is **REVERSED** and **REMANDED** for further proceedings consistent with the findings of this Order; and

2.    The Clerk is **DIRECTED** to enter a judgment accordingly and thereafter close the file.

**DONE** and **ORDERED** in Orlando, Florida, on March 6, 2025.

_____

ROBERT M. NORWAY
*United States Magistrate Judge*

Copies furnished to:

Counsel of Record